**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

LIEUTENANT COLONEL JOHN S. WALSH )
15809 W 95th Place )
Arvada, CO 80007 )
         )
     *Plaintiff,* )
         )
v. )    Civil Action No. 1:26-cv-197.
         )
         )
The Honorable JOHN PHELAN, )
Secretary of the Navy, )
         )
     *Defendant.* )

## PLAINTIFF'S COMPLAINT

### *Introduction*

Lieutenant Colonel ("LtCol") John S. Walsh, of the United States Marine Corps, retired, served his country admirably for over 30 years. While on duty, LtCol Walsh had a relationship with Colonel ("COL") Pamela Martis, U.S. Army. The relationship had no impact on unit morale, efficiency, or cohesion. It was so discreet that it was only exposed by COL Martis herself after its conclusion, to punish LtCol Walsh for leaving her and obtaining a temporary protective order to stop COL Martis' harassment of LtCol Walsh and his family. Regrettably, COL Martis was successful in her goal. LtCol Walsh accepted non-judicial punishment ("NJP") under Articles 133 (conduct unbecoming an officer) and 134 (conduct prejudicial to good order and discipline) of the Uniform Code of Military Justice ("UCMJ") (10 U.S.C. §§ 933 and 934) and, as a consequence, was later reduced in grade upon retirement from his then-current grade of Colonel ("Col") to Lieutenant Colonel.

1

LtCol Walsh applied to the Board for the Correction of Naval Records ("BCNR", "the Board", or "Board"), seeking correction for this injustice. The BCNR instead denied LtCol Walsh's application and all requested relief.

For the reasons which follow, the BCNR (1) reached a decision unsupported by the evidence of record and failed to consider LtCol Walsh's non frivolous arguments; (2) reached a decision contrary to regulation and (3) failed to correct injustice clearly present in the record, all in violation of 5 U.S.C. § 706 (2)(A). LtCol Walsh respectfully asks this honorable Court to remand his application to the BCNR for a new review which complies with all applicable laws and regulations and grant him an award of attorney's fees for the costs of bringing this action, under the Equal Access to Justice Act (28 U.S.C. § 2412(d)(1)(A), (B)).

### *Jurisdiction*

1.      This Court has jurisdiction under 28 U.S.C. § 1331, and under 5 U.S.C. §706(2)(A), which provides for redress in the district courts based upon agency decisions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### *Venue*

2.      Venue is proper under 28 U.S.C. §1391(e)(1).

### *Parties and Timeliness*

3.      Plaintiff, LtCol John S. Walsh, is a citizen of the United States who resides at the address listed in the caption. At all relevant times during the conduct that gave rise to this action, Plaintiff was a citizen of the United States, who was either actively residing in the United States, or on active-duty deployment in the Marine Corps.

4.      Defendant, the Honorable John Phelan, is named exclusively in his official capacity as Secretary of the Navy. The Secretary of the Navy oversees the BCNR, which acts in the

Secretary's name and makes recommendations to the Secretary as to whether applications by past and present members of the Navy and Marine Corps should be granted or denied. *See* 10 U.S.C. § 1552(a)(1).

5.      LtCol Walsh received a letter indicating that, on or about March 31, 2025, the Board had denied his application. As such, this action is timely filed. *See* 28 U.S.C. § 2401(a); *Rempfer v. U.S. Dept. of Air Force Bd. for Correction of Military Records,* 538 F.Supp.2d 200, 206 (D.D.C. 2008).

### *Statement of the Facts*

6.      LtCol Walsh served honorably in the Marine Corps for nearly 30 years from his first enlistment in May 1986 until his retirement in December 2016.

7.      LtCol Walsh deployed to Japan, South Korea, and the Philippines, as well as during Operations Desert Shield and Desert Storm. LtCol Walsh also deployed to the Balkans for Operation Joint Endeavor, the 1995-1996 peacekeeping mission in Bosnia-Herzegovina overseeing the implementation of the Dayton Accords. While deployed to the Balkans, LtCol Walsh participated in Operation Silverwake, evacuating over 1,500 U.S. and Allied personnel from the U.S. embassy during Albania's 1996 civil war. Immediately after this operation, LtCol Walsh deployed to the Democratic Republic of the Congo (then Zaire), for Operation Guardian Retrieval, supporting both the evacuation of U.S. citizens from the country and stabilization operations. LtCol Walsh later deployed to Qatar in support of Operation Iraqi Freedom, Operation New Dawn, and Operation Enduring Freedom. Finally, LtCol Walsh deployed to Afghanistan from June 19, 2012, to June 17, 2013.

8.      During his long and successful career in the Marine Corps, LtCol Walsh became one of the highest decorated officers amongst his peers, earning such awards as the Purple Heart, numerous Air Medals with Combat "V", and the Distinguished Flying Cross with Combat "V" in

1991 while in combat during Operation Desert Storm. While on one of his many missions, LtCol Walsh was struck by a surface to air missile and forced to eject, suffering spinal injury and a significant traumatic brain injury for which he was awarded the Purple Heart. In addition, LtCol Walsh earned a Bronze Star for his one year tour of duty commanding the prestigious Commander International Security Assistance Forces ("ISAF") Advise and Assist Team in Afghanistan from 2012 to 2013. LtCol Walsh also earned the Defense Superior Service Medal, the Legion of Merit, three Meritorious Service Medals, two Navy and Marine Corps Commendation Medals, one Navy Achievement Medal, a Navy Unit Commendation two National Defense Service Medals, the Armed Forces Expeditionary Medal, the Southwest Asia Service Medal, the Afghanistan Campaign Medal, the Global War on Terrorism Medal, the Korean Defense Service Medal, the Armed Forces Service Medal, the Humanitarian Service Medal, five Sea Service Deployment Ribbons, the NATO Medal (ISAF Afghanistan), the Kuwait Liberation Medal (Saudi Arabia), the Kuwait Liberation Medal (Kuwait), along with a host of other awards and educational achievements.

9. During his 30 years of service, LtCol Walsh spent years preparing to deploy, deployed, or returning from a deployment. When not on deployment, he was frequently in command, with demanding, around the clock responsibilities.

10. The sacrifices which LtCol Walsh made for his country exacted a heavy toll on his marriage to his wife, Susan. By the summer of 2010, after 16 years of marriage, LtCol Walsh and Susan had made the decision to no longer have a romantic relationship, and began cohabitating as roommates, rather than husband and wife.

11. At this time, Susan and LtCol Walsh began sleeping in separate bedrooms and no longer had romantic relations. The couple were separated in name, if not in law. Both Susan and

LtCol Walsh believed that their marriage was effectively over.

12.    LtCol Walsh and Susan, however, did not legally divorce, to provide stability for their son, Jack, who was only eight at the time. Although no longer romantically involved, the couple desired to cohabitate because they both believed it was in Jack's best interest.

13.    LtCol Walsh and Susan planned to legally divorce following the final move they would make as part of LtCol Walsh's military career.

14.    LtCol Walsh was scheduled to deploy to Afghanistan from June 19, 2012, to June 17, 2013. LtCol Walsh and Susan discussed initiating divorce proceedings while he was deployed, to ease Jack's transition into living in separate households with his parents.

15.    Following the breakdown of his marriage in the summer of 2010, LtCol Walsh began a relationship with COL Martis, U.S. Army, in approximately December 2011.

16.    While deployed, LtCol Walsh continued his relationship with COL Martis, who was also deployed to Afghanistan.

17.    However, the relationship remained discreet and unknown by any of their fellow officers or personnel. LtCol Walsh and COL Martis served in different branches (Marine Corps and Army, respectively) and under different commanding officers. COL Martis did not report to LtCol Walsh (and vice versa).

18.    LtCol Walsh was, at the time, a Colonel, having been promoted to the O-6 level in June 2007.  Thus, both he and COL Martis held the same rank in their respective services.

19.    After his year-long deployment to Afghanistan concluded, LtCol Walsh was transferred to Colorado and assigned as the Commanding Officer of the Naval Reserve Officers Training Corps ("NROTC") Unit at the University of Colorado. LtCol Walsh's family moved to Colorado with him in 2013.

20.     Although LtCol Walsh and Susan had intended to divorce while he was deployed to Afghanistan, they put their plans on hold because their son was displaying emotional and behavioral issues tied to his father's absence. For the first time, Jack began to struggle academically. Both LtCol Walsh and Susan agreed that Jack, who was now in his early teenage years, needed the stability of a two-parent home and therefore, the couple continued to cohabitate.

21.     But the couple did not have any intention of reconciling. When LtCol Walsh and Susan moved to Colorado in 2013, they purchased two plots in a housing development which were close by each other, with the intent of having a separate house constructed for each of them. The family first lived in a rental home and then moved into LtCol Walsh's newly-built home in 2014, while Susan's home was still under construction.

22.     Susan's home would not be completed until 2015. During their stay together in Colorado, LtCol Walsh and Susan continued to live amicably as cohabitating roommates and friends, not as husband and wife, and slept in different bedrooms.

23.     After moving to Colorado, LtCol Walsh attempted to end his relationship with COL Martis.  COL Martis, however, had no intention of allowing LtCol Walsh to terminate their relationship. She pursued LtCol Walsh aggressively, even violating the law to do so.

24.     COL Martis retired from the Army in January 2013, and, after being employed in another state following that retirement, she moved to Colorado to pursue LtCol Walsh.

25.     COL Martis did not even have a job when she moved to Colorado – as far as she was concerned, her only job was to harass LtCol Walsh as frequently as possible.

26.     COL Martis discovered the housing development where LtCol Walsh and Susan planned to build their houses. COL Martis bought a house only three miles from LtCol Walsh's home, within the same housing development, and ensured her children were sent to the same

school as LtCol Walsh's son.

27. COL Martis later claimed that she moved to Colorado to be closer to her sister. But COL Martis' sister lived more than an hour away from her new home. LtCol Walsh, on the other hand, was less than a ten-minute drive.

28. COL Martis sent LtCol Walsh repeated, unprompted, and generally unreciprocated emails, texts, calls, Facebook friend requests, birthday cards, and other means of communication over the course of several years, both before and after LtCol Walsh's retirement from the Marines.

29. COL Martis also visited LtCol Walsh's on-campus office uninvited and unexpected on four different occasions (September 18, 2013, December 12, 2014, January 28, 2015, and March 31, 2015). Each time, LtCol Walsh introduced her as a colleague from Afghanistan. When LtCol Walsh's office was interviewed during a 2015 investigation, only one person (LtCol Walsh's executive officer) remembered COL Martis.

30. After persistent harassment by COL Martis, LtCol Walsh agreed to meet with her alone one last time, a decision he would later regret. While COL Martis promised to leave LtCol Walsh alone after this meeting, that was a lie.

31. In fact, her efforts to pursue LtCol Walsh only escalated and COL Martis began to harass Susan and Jack to persuade LtCol Walsh to continue their relationship. For example, COL Martis vandalized Susan's car on at least one occasion. On several occasions, witnesses observed COL Martis drive past LtCol Walsh and Susan's home. COL Martis would often wait for Susan to pick up Jack from school and then follow them to LtCol Walsh's home in her car.

32. COL Martis also threatened to reveal the relationship, knowing that this would destroy LtCol Walsh's career in the Marine Corps.

33. On March 31, 2015, LtCol Walsh finally cut off communications with COL Martis

for good.

34.     The next day, on April 1, 2015, while Susan was waiting to pick Jack up from school, COL Martis provoked a dramatic altercation. COL Martis had been waiting for Susan and Jack in the school parking lot. COL Martis knew that Susan and Jack would be there at that time, as Susan was picking Jack up from basketball practice and COL Martis' son was also on the team.

35.     Once COL Martis saw Susan enter the parking lot, she approached Susan's car from behind and began screaming at Susan to roll down her window.

36.     Susan declined, at which point COL Martis began yelling obscenities at her.

37.     COL Martis had printed copies of emails and texts which she had exchanged with LtCol Walsh and began repeatedly trying to shove them under Susan's car's windshield wipers. In the process, carried by the wind, the many printouts blew all over the school parking lot.

38.     The printouts contained graphic and intimate messages between LtCol Walsh and COL Martis. These intimate and graphic messages were still lying strewn all over the parking lot when Jack exited from basketball practice moments later. This experience was highly traumatic and embarrassing for both LtCol Walsh, Susan, and Jack.

39.     In response to this and the other actions COL Martis had been taking, LtCol Walsh and Susan promptly sought a temporary protective order against COL Martis, followed by a permanent protective order.

40.     At a hearing held on April 3, 2015, in the District Court for Jefferson County, Colorado, the Court granted LtCol Walsh and Susan's petition for a temporary protective order against COL Martis.

41.     Three days after the hearing, on April 6, 2015, COL Martis launched a two-pronged counterattack on LtCol Walsh and Susan.

42. First, COL Martis returned to Jefferson County Court, seeking her own protective order against Susan.

43. To its great credit, the Court denied COL Martis' motion.

44. Second, COL Martis contacted the Office of the Inspector General of the United States Marine Corps ("OIG") to lodge a complaint against LtCol Walsh.

45. As COL Martis had retired from the Army in 2013, she knew that there was very little possibility that confessing to a relationship with LtCol Walsh would have any sort of blowback on her own military career or her retirement status.

46. In her complaint, COL Martis detailed her relationship with LtCol Walsh and alleged that LtCol Walsh had assaulted her by knowingly infecting her with herpes simplex virus ("HSV-2"). COL Martis also claimed, without any supporting evidence, that LtCol Walsh had stated he would marry her.

47. While the OIG continued to process COL Martis' complaint, on April 23, 2015, LtCol Walsh and Susan, through legal representation, entered into an agreement with COL Martis, through her legal representation, maintaining a one-year temporary civil protective order against COL Martis.

48. By June 8, 2015, less than two full months later, COL Martis had violated this protective order on at least eight occasions (May 14, 15, 18, 20, 21, 22, 28, and 31, 2015), as documented in police records.

49. On June 19, 2015, the OIG completed its investigation into COL Martis' complaint and delivered its report.

50. The OIG investigation conceded that COL Martis had brought the complaint purely out of a desire for "revenge and retaliation" against LtCol Walsh and Susan for securing a

9

completely justified temporary protective order against COL Martis to protect themselves and their son.

51.    Nevertheless, the OIG recommended that LtCol Walsh be removed from his position and charged at Admiral's Mast with violating Article 133, UCMJ, which prohibits conduct unbecoming of an officer and gentleman, because LtCol Walsh had exchanged graphic and intimate emails, messages, and photographs with COL Martis during their consensual relationship.

52.    The OIG also recommended that LtCol Walsh be charged with violating Article 134, UCMJ, which prohibits adultery, for engaging in a relationship with COL Martis.

53.    Neither the relationship itself nor the repeated illegal actions of Col Martis had any impact on LtCol Walsh's command, his unit, or the Marine Corps writ large. Although Article 133 and 134 offenses are often handled administratively in the service branches without resort to the judicial process, LtCol Walsh was informed of these charges on June 29, 2015.

54.    LtCol Walsh accepted non-judicial punishment ("NJP") at an Admiral's Mast presided over by Rear Admiral ("RDML") Richard Brown, United States Navy, who was LtCol Walsh's commanding officer at the time. Seeking to avoid any further impacts on his family, and believing that he would be permitted to retire in-grade, LtCol Walsh accepted the Article 133 and 134, UCMJ, charges.

55.    As punishment for his violations of Articles 133 and 134, UCMJ, LtCol Walsh received a letter of reprimand.

56.    By memorandum dated September 9, 2015, LtCol Walsh's case was referred to a Board of Inquiry ("BOI") for its recommendation as to whether LtCol Walsh should be involuntarily retired from the Marine Corps, and if so, whether he should be retired at his current grade (O-6, Colonel), or a lower grade.

57.     On January 5, 2016, RMDL Brown recommended that Col. Walsh be allowed to retire at his current grade (O-6, Colonel).

58.     The next officer in the chain of command, Brigadier General ("BGen") Paul Kennedy, Commanding General of the Marine Corps Recruiting Command, similarly recommended that LtCol Walsh be allowed to retire at his then-current grade (O-6, Colonel).

59.     However, in an unusual move, the next reviewing officer, Lieutenant General ("LtGen") Robert S. Walsh[1] disregarded these recommendations and recommended that LtCol Walsh be downgraded from O-6 (Colonel) to O-5 (Lieutenant Colonel).

60.     The administrative record is unclear regarding LtGen Walsh's rationale for downgrading LtCol Walsh.  Indeed, such an action is rare because the standard for an officer grade determination is to retire the officer in the last rank where he served honorably, *see* 10 U.S.C. § 1370(a)(1), and LtCol Walsh's relationship with COL Martis did not predate his promotion to Colonel.

61.     Nevertheless, LtGen Walsh's recommendation was adopted, and on December 21, 2016, after more than thirty years of honorable service to our nation, including nine years and six months as a Colonel, during which he was a noteworthy Commanding Officer three times with two of those highly successful command tours occurring during the time period of his relationship with COL Martis, LtCol Walsh was separated from the Marines in the grade of O-5.

62.     On or about December 31, 2021, LtCol Walsh applied to the BCNR.

63.     In his application, LtCol Walsh requested that his acceptance of NJP be vacated, that any and all references to the NJP and the associated Article 133 and 134, UCMJ, charges be removed from his military record, that the letter of reprimand he received from his NJP be

---

[1] No relation to LtCol Walsh.

removed, that his narrative reason for separation ("Unacceptable Conduct") on his DD Form 214 be corrected, that the referral to the BOI and the finding of adverse fitness be removed from his military records, that his rank be corrected to O-6 (Colonel), that he receive all backpay and benefits to which he would have otherwise been entitled had he not been issued the erroneous and unjust reduction in pay grade, and any other relief the BCNR deemed just and proper.

64. In support of this requested relief, LtCol Walsh argued that pleas must be sufficiently established by the facts contained within the record, independent of any plea by the accused; if a plea is not sufficiently established by the facts of the record, it is improvident and must be vacated.

65. LtCol Walsh further argued that because a preponderance of the evidence did not satisfy the necessary elements for the Article 133 and 134, UCMJ, charges for which LtCol Walsh had accepted NJP, his acceptance of NJP was improvident.

66. LtCol Walsh also argued that even if his acceptance of NJP was not improvident, he still should not have been reduced in pay grade on separation pursuant to SECNAVINST 1920.6c, as he did not satisfy the regulation's criteria for a reduction in grade.

67. In support of this argument, LtCol Walsh cited the limited nature and severity of the relationship, as well as its failure to have any impact on the performance of his military duties, as evidenced by his strong personnel evaluations while the relationship was happening.

68. LtCol Walsh further argued that the recommendations of his chain of command, as well as other relevant considerations, militated against his reduction in grade.

69. LtCol Walsh submitted voluminous evidence to the BCNR, including no less than 35 exhibits.

70. Among this evidence, LtCol Walsh submitted fitness reports ("FITREPs") which

reflected a consummate officer with a history of outstanding performance. The evidence submitted by LtCol Walsh demonstrated that his command was not aware of the relationship, and neither was anyone else in the Marine Corps or any other branch of the military, until COL Martis came forward.

71.     LtCol Walsh also submitted evidence showing that he had spent nearly five full years as an O-6 prior to beginning the relationship with COL Martis, and of his nine years and six months of service as an O-6, barely more than a third were concurrent with the relationship. *See* 10 U.S.C. § 1370(a)(1) (requiring that an officer be retired in in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily); *see* SECNAVINST 1920.6c (outlining six criteria to be considered when determining whether to reduce an officer's grade upon retirement).

72.     The BCNR received an advisory opinion in LtCol Walsh's case on October 19, 2022. LtCol Walsh responded to the advisory opinion on April 24, 2024.

73.     On or about March 31, 2025, the BCNR reached a decision on LtCol Walsh's recommendation, denying his application and all requested relief.

74.     Although the BCNR determined that LtCol Walsh had not submitted his application within the three-year period required by 10 U.S.C. § 1552, the BCNR waived the statute of limitations and assessed LtCol Walsh's application on the merits because the Board found that doing so was in the interests of justice.

75.     Reviewing LtCol Walsh's argument that because a preponderance of the evidence did not satisfy the necessary elements for the Article 133 and 134, UCMJ, charges to which LtCol Walsh had accepted NJP, his acceptance of NJP was improvident, the BCNR determined that

> there was no requirement for the NJP authority to establish an independent factual basis to find you guilty of the offenses, i.e. your

13

admissions would have been sufficient… At NJP, the Commander relied upon the preponderance of evidence standard, that included the substantiated CI, supporting evidence and your guilty pleas, when finding you guilty.

With regard to the alleged violation of Article 133, UCMJ, the Board determined that there was sufficient evidence to find that your conduct was unbecoming of an officer and gentleman. The nature of Article 133, UCMJ, focuses on conduct that is likely to seriously compromise your standing or character as an officer. The Commander was not in error by finding that sending sexually explicit emails and text messages compromised your standing and character as an officer and as a CO [commanding officer]…

With regard to your alleged violation of Article 134, UCMJ, the Board determined that your conduct met the elements for Article 134. The Board found sufficient evidence that you committing [sic] adultery with a woman, not your wife. The evidence included your repeated admissions to having a sexual relationship with a paramour, your married status during the years of the relationship, and the fact your conduct was deemed prejudicial to good order and discipline by your chain of command. According to the MCM, "[w]hile extramarital conduct that is private and discreet in nature may not be service discrediting by this standard, under the circumstances, it may be determined to be conduct prejudicial to good order and discipline." Thus the Board determined the Commander was not in error by finding that your misconduct was prejudicial to good order and discipline.

76. In response to LtCol Walsh's argument that even if his acceptance of NJP was not improvident, he still should not have been reduced in pay grade on separation pursuant to SECNAVINST 1920.6c, the BCNR stated that

Even if the Board accepted your contention that your plea of guilt was improvident, you admitted to having a sexual relationship with a woman not your wife, over several years, and that your performance of duty was substandard. As such, the determination that you failed to serve satisfactorily in the grade of Col was well supported by the evidence.

77. Following the BCNR's denial of his application, LtCol Walsh now comes with this complaint.

14

*Plaintiff's First Claim*

**Violation of 5 U.S.C. § 706 (2)(A) – When Reviewing LtCol Walsh's Argument That a Preponderance of the Evidence Did Not Satisfy The Necessary Elements For the Article 133 and 134, UCMJ, Charges, the BCNR Reached a Decision Unsupported by the Evidence of Record and Failed to Consider LtCol Walsh's Non Frivolous Argument.**

78.    The allegations of the preceding paragraphs are incorporated by reference as if fully stated herein.

79.    Federal courts have the obligation to "hold unlawful and set aside" any agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

80.    Decisions of the BCNR which are unsupported by the evidence of record are arbitrary and capricious: "To put it simply, a decision unsupported by evidence would be arbitrary." *Mitchell v. Del Toro,* 2024 WL 4891906 *1, *4 (D.D.C. November 26, 2024), citing *Ass'n of Data Processing Serv. Orgs. v. Bd. Of Govs. of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984).

81.    A BCNR decision is also considered arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem" presented in an application. *See Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).

82.    The BCNR entirely fails to consider an important part of the problem presented in an application if the BCNR either does not address, or does not explain why it is not addressing, non-frivolous arguments raised by an applicant. *See Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997); *see also Saint–Fleur v. McHugh*, 83 F.Supp.3d 149, 155 (D.D.C. 2015); *Rudo v. Geren*, 818 F. Supp. 2d 17, 26-7 (D.D.C. 2011); *Calloway v. Brownlee*, 366 F. Supp. 2d 43, 55 (D.D.C. 2005).

83.     If the BCNR meets an applicant's argument with silence, that means the BCNR has failed to consider that argument. *Tennekoon v. Fanning,* 156 F.Supp.3d 208, 218 (D.D.C. 2016). *See also Mori v. Dep't of the Navy*, 917 F.Supp.2d 60, 64 (D.D.C.2013) ("By not discussing plaintiff's evidence, the Secretary leaves plaintiff and the Court to scratch their heads as to why the Secretary found plaintiff's evidence unpersuasive").

84.     Here, the BCNR's conclusion that a preponderance of the evidence satisfied the necessary elements for the Article 133 and 134, UCMJ, charges which LtCol Walsh accepted was unsupported by the record. The BCNR also failed to consider LtCol Walsh's nonfrivolous argument that no facts in the record substantiated the finding by LtCol Walsh's commander that his misconduct was prejudicial to good order and discipline.

85.     Although NJP is not the same as a court-martial, servicemembers nonetheless retain Constitutional due process protections at NJP. *United States v. Stoltz,* 720 F.3d 1127, 1133 (9th Cir. 2013) (holding that the violation of a servicemember's due process rights at NJP constitutes a grievance which can be redressed by a military correction board); *United States v. Booker*, 5 M.J. 238, 243 (C.M.A.1977) (holding that "due process considerations attach to [nonjudicial punishment]"); *see also Cochran v. United States*, 1 Cl. Ct. 759, 770 (1983).

86.     "Not every deviation from the high standard of conduct expected of an officer constitutes conduct unbecoming an officer" under Article 133, UCMJ. *United States v. Shober,* 26 M.J. 501, 503 (A.F.C.M.R.) (citation omitted), *aff'd*, 23 M.J. 249 (C.M.A. 1986).

87.     An Article 133, UCMJ, offense must so seriously transgress "against law, justice, morality, or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents." *United States v. Amazaki*, 67 M.J.

666, 671 (A. Ct. Crim. App. 2009).

88.     Generally, an Article 133, UCMJ, offense "must be so disgraceful as to render an officer unfit for service." *U.S. v. Guaglione*, 27 M.J. 268, 271 (C.M.A. 1988).

89.     "Article 133, UCMJ was never intended as a catchall for every conceivable improper act or misdeed…. To allow it to become so would invite reappraisal of its constitutionality." *Amazaki*, 67 M.J. at 671 (internal citations and quotations omitted).

90.     Here, the misconduct charged against LtCol Walsh – exchanging graphic and intimate emails, messages, and photographs with COL Martis during a private, consensual relationship between two consenting adults – was not "so disgraceful" as to render LtCol Walsh "unfit for service." *Guaglione*, 27 M.J. at 271.

91.     The exchange of graphic and intimate private communications between two consenting sexual partners is a commonplace occurrence. It certainly does not rise to the level of a transgression which is so "against law, justice, morality, or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents." *Amazaki*, 67 M.J. at 671.

92.     Because LtCol Walsh's behavior could not possibly have satisfied the elements of the charge, his acceptance of a violation of Article 133, UCMJ, punishes him for an offense he did not commit, violating the due process to which all servicemembers are entitled at NJP. *See Stoltz*, 720 F.3d at 1133; *Booker*, 5 M.J. at 243; *see also Cochran*, 1 Cl. Ct. at 770.

93.     This certainly presented an error or injustice which the BCNR was bound to correct. *See* 10 U.S.C. § 1552(a)(1).

94.     The BCNR's conclusion that "there was sufficient evidence to find that your

17

conduct was unbecoming of an officer and gentleman" was completely unsupported by the evidence of record and failed the BCNR's obligation to show a rational connection between the facts found and the decision made. *Mitchell,* 2024 WL 4891906 at *4; *see Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (agency decision must show "rational connection between the facts found and the choice made"); *see also Frizelle*, 111 F.3d at 176 (adopting this standard for the BCNR).

95.     The BCNR's decision was therefore arbitrary and capricious. 5 U.S.C. § 706(2)(A).

96.     Moreover, LtCol Walsh's charged conduct also could not have satisfied the elements of Article 134, UCMJ.

97.     "[N]ot every act of adultery by a servicemember constitutes an offense under the UCMJ." Instead, the conduct of the accused must be shown to have been "to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces." *United States v. Jonsson*, 67 M.J. 624, 626 (C.G. Ct. Crim. App. 2009)

98.     "Adulterous conduct that is directly prejudicial includes conduct that has *an obvious, and measurably divisive effect* on unit or organization discipline, morale, or cohesion, or is *clearly detrimental* to the authority or stature of or respect toward a servicemember" (internal citations omitted; italics in original). *Jonsson*, 67 M.J. at 626. *See also United States v. Tadlock*, ARMY 20110366 (Army Ct. Crim. App. Jan. 25, 2013) (holding that "speculative prejudice or discredit" cannot satisfy the elements of adultery under Article 134, UCMJ).

99.     Here, LtCol Walsh's charged conduct failed to satisfy a critical element of Article 134, UCMJ – there was no evidence in the record to demonstrate that his relationship with COL Martis was either "directly prejudicial to good order and discipline" or "service discrediting." *Manual for Courts-Martial, United States*, Part IV, ¶62.c.(2) (2012)

100.    The relationship between COL Martis and LtCol Walsh remained discreet and unknown by any of their fellow officers or personnel. LtCol Walsh and COL Martis served in different branches (Marine Corps and Army, respectively), under different commanding officers. COL Martis did not report to LtCol Walsh (and vice versa). Both held the same rank in their respective services (at the relevant time, Colonel). Thus, the relationship did not cause any issues with fraternization or create a conflict of interest.

101.    "While an adulterous relationship between two personnel assigned to different units could have impacts sufficiently prejudicial to good order and discipline to fulfill the third element of the adultery offense, the record must identify those impacts. In this case, the record is devoid of such information." *Jonsson*, 67 M.J. at 626.

102.    Here again, because LtCol Walsh's behavior could not possibly have satisfied the elements of the charge, his acceptance of a violation of Article 134, UCMJ, punishes him for an offense he did not commit, violating the due process to which all servicemembers are entitled at NJP. *See Stoltz,* 720 F.3d at 1133; *Booker*, 5 M.J. at 243; *see also Cochran*, 1 Cl. Ct. at 770.

103.    This too presented an error or injustice which the BCNR was bound to correct. *See* 10 U.S.C. § 1552(a)(1).

104.    However, the BCNR instead made two critical errors when assessing this issue.

105.    First, the BCNR did not respond to LtCol Walsh's argument that there was no specific documentation in the record of any evidence that his relationship with COL Martis was either "directly prejudicial to good order and discipline" or "service discrediting," *MCM*, Part IV, ¶62.c.(2), thus rendering his conduct unable to satisfy an essential requirement of Article 134, UCMJ.

106.    The BCNR therefore failed to respond to LtCol Walsh's non-frivolous argument.

On this basis alone, the BCNR's decision is arbitrary and capricious. *See Saint–Fleur*, 83 F.Supp.3d at 155; *Rudo*, 818 F. Supp. 2d at 26-7; *Calloway*, 366 F. Supp. 2d at 55.

107.    Second, the BCNR compounded its first error by finding that LtCol Walsh's relationship with COL Martis was either directly prejudicial to good order and discipline or service discrediting simply because his commanding officers said so: "your conduct was deemed prejudicial to good order and discipline by your chain of command."

108.    This is not a factual finding at all; it is merely a regurgitation of the required element of Article 134, UCMJ, which is in dispute. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.")

109.    Here again, the BCNR's conclusion that LtCol Walsh's conduct was "prejudicial to good order and discipline" was completely unsupported by the evidence of record and failed the BCNR's obligation to show a rational connection between the facts found and the decision made. *Mitchell,* 2024 WL 4891906 at *4; *see Frizelle*, 111 F.3d at 176.

110.    For these reasons too, the BCNR's decision was therefore arbitrary and capricious. 5 U.S.C. § 706(2)(A).

### *Plaintiff's Second Claim*

**Violation of 5 U.S.C. § 706 (2)(A) – When Reviewing LtCol Walsh's Argument That Even If His Acceptance of NJP Was Not Improvident, He Still Should Not Have Been Reduced in Pay Grade on Separation Pursuant to SECNAVINST 1920.6c, the BCNR Reached a Decision Contrary to Regulation.**

111.    The allegations of the preceding paragraphs are incorporated by reference as if fully stated herein.

112.    Federal courts have the obligation to "hold unlawful and set aside" any agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706 (2)(A).

113.    Regulations "validly prescribed by a government administrator are binding upon him as well as the citizen…even when the administrative action under review is discretionary in nature," *Service v. Dulles,* 354 U.S. 363, 372 (1957), and it is "a fundamental principle of administrative law that an agency is bound to adhere to its own regulations." *Fuller v. Winter*, 538 F. Supp. 2d 179, 187-8 (D.D.C. 2008), citing *Frizelle*, 111 F.3d at 177.

114.    The BCNR shares this obligation common to all federal agencies and is not permitted to make decisions contrary to law or regulation. *Walker v. Shannon,* 848 F. Supp. 250, 255 (D.D.C. 1994).

115.    Here, when reviewing LtCol Walsh's argument that, even if his acceptance of NJP was not improvident, he still should not have been reduced in pay grade on separation pursuant to SECNAVINST 1920.6c, the BCNR reached a decision unsupported by the evidence of record and contrary to regulation.

116.    SECNAVINST 1920.6c was binding guidance on the Marine Corps at the time of LtCol Walsh's retirement. *See, e.g., Catawba County v. EPA,* 571 F.3d 20, 33-34 (D.C. Cir. 2009).

117.    Under SECNAVINST 1920.6c, the following criteria are used by the Marine Corps to determine whether a member should retain the pay grade currently held or be reduced to the next inferior pay grade based on unsatisfactory performance upon retirement:

> (1) The nature and severity of the misconduct;
>
> (2) The misconduct and its relation to, and effect on, the performance of military duties;
>
> (3) All fitness reports and other portions of the service record which reflect performance in the current pay grade, and whether the misconduct was known by reporting seniors, and if not, what effect, if any, it might have had on the respondent's record;
>
> (4) Time in current grade and its relationship to the time of the

misconduct;

(5) Other relevant matters presented by the record or the respondent;

(6) Chain of command recommendations.

118.    These factors are largely mirrored by similar regulations in other service branches. *See, e.g., Draper v. United States*, 163 Fed.Cl. 284, 287 (2022) (Air Force conducted review of applicant's records to determine whether he should be retired in his current grade considering "[1] the nature and length of…improper conduct, [2] the impact the conduct had on military effectiveness, [3] the quality and length of…service in each grade at issue, [4] past cases involving similar conduct, and [5] the recommendations of the officer's chain of command").

119.    Here, all six factors of SECNAVINST 1920.6c favored allowing LtCol Walsh to retire in his then-current grade (O-6, Colonel).

120.    *First*, LtCol Walsh's relationship happened while he was effectively separated from his wife, rendering the nature and severity of his misconduct relatively mild as compared to other acts of adultery. *See* SECNAVINST 1920.6c.

121.    *Second,* the relationship had no demonstrated impact on the performance of LtCol Walsh's – or any other person's – military duties. *See* SECNAVINST 1920.6c; *see also Draper*, 163 Fed.Cl. at 287 (concluded that although "[v]iewing sexually explicit materials on a government computer is clearly inappropriate and prohibited behavior, ... [t]here appears to have been little impact on miliary effectiveness ... service as a Colonel was otherwise exemplary").

122.    *Third*, and relatedly, LtCol Walsh submitted evidence of his continued exemplary performance as a Marine to the BCNR in the form of FITREPs which gushed about his performance, as well as a number of medals and awards including the Defense Superior Service Medal and Bronze Star. LtCol Walsh's command was not aware of the relationship, and neither was anyone else in the Marine Corps or any other branch of the military, until COL Martis came

22

forward. *See* SECNAVINST 1920.6c.

123. *Fourth*, Col. Walsh spent nearly five full years as an O-6, Colonel, prior to beginning the relationship with COL Martis, and of his nine years and six months of service as an O-6, Colonel, barely more than a third were concurrent with the relationship. *See* SECNAVINST 1920.6c.

124. *Fifth*, LtCol Walsh's service was otherwise long and exemplary, as demonstrated by his many awards, extended career, and difficult assignments, among other factors. *See* SECNAVINST 1920.6c.

125. *Sixth*, although LtGen Walsh recommended that LtCol Walsh not be permitted to retire in his current grade, BGen Kennedy and RDML Brown both recommended that LtCol Walsh should be retired in his current grade. The sixth factor therefore also cuts in LtCol Walsh's favor. *See* SECNAVINST 1920.6c.

126. But, disregarding the proper evaluation of all six factors of SECNAVINST 1920.6c, the BCNR concluded that because LtCol Walsh "admitted to having a sexual relationship with a woman not your wife, over several years, and that [his] performance of duty was substandard" that therefore "the determination that [LtCol Walsh] failed to serve satisfactorily in the grade of Col was well supported by the evidence."

127. The BCNR's conclusion failed to properly assess LtCol Walsh's request under the binding six-factor rubric of SECNAVINST 1920.6c. *Catawba County,* 571 F.3d at 33-34.

128. The BCNR's conclusion thus failed to abide by binding regulation. *See Fuller*, 538 F. Supp. 2d at 187-8; citing *Frizelle*, 111 F.3d at 177; *see also Walker,* 848 F. Supp. at 255.

129. The BCNR's decision was therefore arbitrary and capricious, in violation of 5 U.S.C. § 706 (2)(A).

23

### *Plaintiff's Third Claim*

**Violation of 5 U.S.C. § 706 (2)(A) – When Reviewing LtCol Walsh's Application, the BCNR Failed to Correct Injustice Clearly Present in the Record.**

130.    The allegations of the preceding paragraphs are incorporated by reference as if fully stated herein.

131.    Federal courts have the obligation to "hold unlawful and set aside" any agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

132.    When the BCNR "fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate. And such a violation, contrary to the evidence, is arbitrary and capricious." *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014). *See also Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (Secretary obligated not only to properly determine the nature of any error or injustice, but to take "such corrective action as will appropriately and fully erase such error or compensate such injustice"); *Dodson v. United States Gov't Dept. of Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (correction boards "have a duty to determine whether there has been error or injustice and, if there has been, to grant thorough and fitting relief"); *Sanders v. United States*, 219 Ct.Cl. 285, 299 (1979) (holding that the Secretaries of the military departments, acting through correction boards, have not only the "power" but also the "duty" to correct injustice.)

133.    Here, the BCNR failed to correct injustice clearly present in the record.

134.    The investigation into LtCol Walsh's relationship with COL Martis was only possible because COL Martis used the OIG as a weapon to harm LtCol Walsh, after stalking and harassing him for years.

135.    COL Martis followed LtCol Walsh across the country; moved into the same

24

housing development; sent her children to the same school as LtCol Walsh's son; sent LtCol Walsh repeated, unprompted, and generally unreciprocated emails, texts, calls, Facebook friend requests, birthday cards, and other means of communication; visited LtCol Walsh's office uninvited on four different occasions (September 18, 2013, December 12, 2014, January 28, 2015, and March 31, 2015); harassed Susan and Jack; followed Susan and Jack; threatened Susan and Jack; threatened LtCol Walsh; drove past LtCol Walsh's home; vandalized Susan's car; and screamed at and assaulted Susan and Jack at the parking lot of Jack's school.

136.    When, after months of outrageous behavior, LtCol Walsh and Susan obtained a completely justified temporary protective order against COL Martis, her efforts to manipulate and terrorize LtCol Walsh only intensified.

137.    COL Martis sought her own temporary protective order against Susan, purely out of spite. She violated the temporary protective order instructing her to stay away from LtCol Walsh and Susan at least eight times in the first two months.

138.    And though these efforts did not advance COL Martis' desperate crusade to bring LtCol Walsh under her control, one tactic did work: filing a complaint with the OIG.

139.    This complaint set in motion a chain of events which eventually led to LtCol Walsh's NJP and retirement from the Marine Corps in a lower grade.

140.    Even the OIG investigation itself recognized that COL Martis' complaint had been brought out of a desire for "revenge and retaliation" against LtCol Walsh and Susan for securing the temporary protective order.

141.    The BCNR had the chance, when evaluating LtCol Walsh's evaluation, to end the suffering which LtCol Walsh has endured from COL Martis for no reason other than wanting to live his life independent of their prior relationship.

142.   Instead, the BCNR denied LtCol Walsh's application, granting their enthusiastic approval of COL Martis' abuse and sending the message to service members everywhere that they can weaponize the OIG process all they want without experiencing any consequences – only their intended victims will suffer.

143.   In short: the BCNR failed its statutory duty to correct a clearly present injustice. 10 U.S.C. § 1552(a)(1); *see Haselwander*, 774 F.3d at 996.

144.   All in violation of 5 U.S.C. § 706 (2)(A).

### *Prayer for Relief*

WHEREFORE, Plaintiff prays that judgment be entered:

(a) Holding that when reviewing LtCol Walsh's argument that a preponderance of the evidence did not satisfy the necessary elements for the Article 133 and 134, UMCJ, charges to which LtCol Walsh had pled guilty, the BCNR reached a decision unsupported by the evidence of record and failed to consider LtCol Walsh's non frivolous arguments, in violation of 5 U.S.C. § 706 (2)(A); and,

(b) Holding that when reviewing LtCol Walsh's argument that even if his pleas were not improvident, he still should not have been reduced in pay grade on separation pursuant to SECNAVINST 1920.6c, the BCNR reached a decision contrary to regulation, in violation of 5 U.S.C. § 706 (2)(A); and,

(c) Holding that when reviewing LtCol Walsh's application, the BCNR failed to correct injustice clearly present in the record, in violation of 5 U.S.C. § 706 (2)(A); and,

(d) Remanding LtCol Walsh's application to the BCNR for a new review which complies with all applicable laws and regulations; and,

(e) Granting an award of attorney's fees to LtCol Walsh for the costs of bringing this action, under the Equal Access to Justice Act (28 U.S.C. § 2412(d)(1)(A), (B)); and,

(f) Any other and further relief as the Court may deem, in the circumstances, be just and proper.

Dated January 22, 2026.                    Respectfully submitted,

*/s/ Dylan Thayer*
Dylan Thayer
DC Bar No. 90015821

*/s/David P. Sheldon*
David P. Sheldon
DC Bar No. 446039
Law Offices of David P. Sheldon, P.L.L.C.
100 M Street, S.E., Suite 600
Washington, DC  20003
Tel: 202.546.9575
Fax: 202.546.0135

*Attorneys for Plaintiff*